## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, William L. Epkins, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office, (hereinafter affiant), being duly sworn, depose and state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation.  I have been so employed for one year and nine months and am currently assigned to the Violent Crime Squad of the Washington Field Office.  I have participated in numerous investigations and search warrants resulting in the convictions of numerous defendants, including bank robbery cases, and many current open investigations, including threats and kidnaping.

2.  This affidavit is submitted in support of a search warrant for the contents of a computer and the memory of a digital camera seized pursuant to a prior search warrant, issued by a United States Magistrate Judge in the District of Maryland, for the premises of 9731 Muirkirk Road, Apartment A-34, Laurel, Maryland, for evidence relating to kidnaping and first degree sexual abuse, in violation of 18 U.S.C. §1201 and 22 D.C. Code, §3002.  That evidence has since been transferred to the evidence control center of the FBI Washington Field Office, which is located at 601 Fourth Street, N.W., in Washington, D.C.

3.  The facts and information contained in this affidavit are based upon my personal knowledge and the investigation and observations of other officers and agents involved in the

-2-

investigation. All observations referenced below that were not personally made by me were related to me by the persons who made such observations. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government. The facts and circumstances of the offense and subsequent description of the evidence and the premises are listed below:

4. On November 5, 2005, the victim female (hereafter referred to as C-1), was working as a prostitute in the 1100 block of Vermont Avenue, N.W., in Washington, D.C., when she was approached by a Hispanic male (hereafter referred to as S-1) in a small grey sport utility vehicle. After a brief conversation in which S-1 purported to engage C-1 for sexual services, C-1 got into S-1's vehicle.

5. After C-1 got into the vehicle, S-1 drove off at a high rate of speed, and parked a short distance away, in a darkened area. S-1 got into the back seat, grabbed C-1 by the hair and displayed a firearm, and immediately made a call on a cellular telephone, speaking in Spanish into the telephone. Within seconds, a second Hispanic male (hereafter referred to as "S-2") appeared at the car.

6. After the arrival of S-2, both S-1 and S-2 pulled C-1 by her hair, also punching and hitting her, into the back seat from

-3-

the front passenger seat.  C-1 fought with the two men, and was
able to bite each of them, but ultimately, S-1 and S-2 forced
her, face-down, to the back-seat floor.  C-1 was blindfolded with
a black "hoodie" sweatshirt.  At the same time S-2 got behind the
wheel and started to drive a short distance away, while S-1
forcibly removed C-1's pink lace thong-style underpants.  S-1 put
his finger in C-1's vagina and asked "Are you clean?"  Then he
put his penis in her mouth and said, "you better not bite me or
I'll kill you; you better do a good job."

    7.  While S-1 was assaulting C-1, S-2 made a call on a
cellular telephone, to a third individual (hereafter referred to
as "S-3'), speaking in English.  S-2 told S-3 what sounded like
their location, and kept inquiring where he was, saying, "I don't
see you."  While S-1 and S-2 waited for S-3, S-2 got into the
back seat, and the two men continued to attack C-1.  S-1 began to
have vaginal intercourse with C-1 and S-2 put his penis in her
mouth, engaging in oral sex.  C-1 did not consent to sexual
contact with either of the men or to being beaten.

    8.  A short time later, S-3 came to the vehicle and got into
the front seat, stating that he "wants some."  After getting into
the back seat, S-3 said, "Let's go to my house; let's go to my
brother's house, where we can be more comfortable."  C-1 did not
consent to sexual contact with S-3, and did not consent to being
transported from her original location.

-4-

9.  One of the first two suspects (S-1 or S-2) drove the
vehicle away, with C-1 and all three men in the vehicle, and
along the way stopped at a "Crown" gas station.  Your affiant has
spoken to law enforcement officers of the D.C. Metropolitan
Police Department, who are unaware of the presence of Crown gas
stations in the District of Columbia.  When the vehicle arrived
at the gas station, the three men (S-1, S-2, and S-3) began to
argue, one of the men saying, "why are we stopping with the bitch
in the car?"  At this point, she looked up from the floor and was
able to see over the blindfold that S-3 is an African-American
male.  One of the men forced C-1's head back to the floor, and
the car drove away without getting gas.

10.  After driving for a short time, the car stopped, and
S-3 said "Make sure her head is covered up good so she can't see"
and S-3 came around and opened the back door, at which time C-1
was taken from the vehicle.  While C-1 was walking with the three
men, she could nevertheless see over the top of the blindfold
that the building they were entering had the number "9723" on the
side.  C-1 was taken down some steps and straight into the door
of an apartment.  Once inside, C-1 was put on the floor in a
front room (very near to the front door), in a carpeted area.
Thereafter, all three subjects took turns engaging in oral and
vaginal sexual intercourse with C-1.  C-1 reports that she was
crying, kicking, and begging the men to stop, and one of the men

-5-

punched her and said "we still have the gun." The assault continued for about an hour to an hour-and-a-half, and she remembers that one of the men took pictures of the others assaulting her. C-1 heard one of the men tell others that he would send them copies of the photographs by e-mail. C-1 also reports that none of the men used a condom during the sexual assaults.

11. After the assault, C-1 was forced back into the vehicle, and all three men drove with her to a location where she was ultimately released. To get there, C-1 says the car took two immediately turns, and then drove straight for a somewhat longer period of time. At the location where she was released, C-1 saw numerous police vehicles, and ran to find a police officer. She reported the assault and sexual assault to a police officer (later identified as D.C. MPD Officer Ruiz). She also realized that her purse and business cards had been taken during the course of the assault. Your affiant has determined that C-1 was released in the vicinity of the corner of South Dakota Avenue and V Street, N.E., in Washington, D.C. C-1 was transported to Howard University Hospital where she was examined and treated. Medical records of the examination reveal the presence of what appeared to be semen on C-1's clothing, body and in her head hair. A forensic evidence kit including vaginal and oral swabs and head and pubic hair combings was taken at this time and her clothing

-6-

was retained for further forensic examination.

12. On November 6, 2005, C-1 received a telephone "voice-mail" message from an individual who stated that he was "calling to apologize" for what happened two nights before, because "he didn't know the circumstances" and hoped that "she got where she was needed to be alright."

13. On November 7, 2005, C-1 received several additional telephone calls, one of which she answered. The same individual who left the "voice-mail" message the day before stated that he "didn't know the circumstances" of how "his friends got her" but that he and his friends always have sex together with women that they meet and like to take pictures.

14. Law enforcement officers contacted prosecutors in the District of Columbia, and obtained a D.C. Superior Court grand jury subpoena for the telephone records of C-1's cellular telephone, and the subscriber records of the caller on November 6 and 7, 2005. The information taken from records obtained pursuant to the subpoena reflects that the telephone calls corresponding to the voice-mail on November 6 and the November 7 conversation identified by C-1, came from telephone number (301) 404-3254. A search of public and law enforcement databases reflects that (301) 404-3254 is listed to an individual named "DAMIAN THORPE," who has several addresses, including 9731 Muirkirk Road, in Laurel, Maryland.

-7-

15.  Law enforcement officers obtained a photograph of
DAMIAN THORPE, PDID # 562-776, date of birth 09-07-84, an
African-American male, and created a photo array of nine
individuals with similar facial characteristics (including build,
age, complexion, hairstyle and facial hair), and showed the array
to C-1, who positively identified the photograph of DAMIAN THORPE
as S-3, the African-American male described in the events set
forth, above. [NOTE:  During a search of the premises (as
described below), an individual who identified himself as DAMIEN
THORPE was arrested on the premises.  This individual has facial
features bear a striking resemblance to PDID # 562-776; however,
it was then determined that the fingerprints of this "DAMIAN
THORPE" do not match the fingerprints of the man associated with
PDID # 562-776.  Agents later located and interviewed the
individual associated with PDID # 562-776 and determined that he
is a brother named "Rolando" Thorpe.  The arrested DAMIAN THORPE
was released, but a buccal swab containing his DNA sample was
obtained pursuant to a subsequent search warrant, and the sample
has been submitted to the FBI laboratory for comparison to
evidence taken from a "rape kit" associated with C-1, and from
the carpet near the front door of 9731 Muirkirk Road.]

16.  Prior to obtaining the original search warrant, your
affiant and other law enforcement officers went to the residences
located at and near 9731 Muirkirk Road, in Laurel, Maryland and

-8-

observed that 9731 Muirkirk Road is actually Apartment A-34, at
the rear of a building that in the front, as you approach from a
parking lot, is labeled "9723" Muirkirk Road, as described by C-
1, and is reached by entering the main building and walking down
several stairs.  In addition, your affiant and other law
enforcement officers drove from this apartment to the D.C.
location where C-1 was ultimately released, and the drive
consists of two immediate turns and then a long straight drive
down the Baltimore-Washington Parkway, as described by C-1.
Finally, your affiant and other law enforcement officers have
determined that there are several "Crown" gas stations in
Maryland, along the way from Muirkirk Road to the border with the
District of Columbia, the path to the location where C-1 was
released.

    17.  The affiant obtained and on December 2, 2005, executed
a search warrant for the premises located at 9731 Muirkirk Road,
Apartment A-34, and recovered several items, including suspected
semen samples in the carpeted area near the front door, ladies'
underwear, a digital camera, and a computer, both suspected of
having been utilized to photograph the assault and e-mail the
photographs, based on the comments set forth in paragraph 10,
above.  The digital camera and computer were brought to the FBI
evidence control center in Calverton, Maryland, and subsequently
transferred to the FBI evidence control center in Washington,

-9-

D.C., located at 601 Fourth Street, N.W.

18. Based on the foregoing, there is probable cause to
believe that evidence of kidnaping and first degree sexual
assault are located in the contents of the computer and the
memory of the digital camera seized on the premises of 9731
Muirkirk Road, Apartment A-34, in Laurel, Maryland, and is now in
the custody of the FBI Washington Field Office located at 601
Fourth Street, N.W., Washington, D.C.


_____
William L. Epkins
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me this __ day of _____, 2005.


_____
United States Magistrate Judge